**Martin BRYAN, Petitioner–Appellant,**

v.

**Jack DUCKWORTH, Respondent–Appellee.**

No. 94–2509.

United States Court of Appeals, Seventh Circuit.

Submitted Nov. 14, 1995.

Decided June 7, 1996.

---

**3.** We express no opinion as to factual scenarios not before us, such as gestures.

Martin Bryan, Pendleton, IN, pro se.

Martha J. Arvin, Office of the Attorney General, Indianapolis, IN, for Jack R. Duckworth.

Before POSNER, Chief Judge, and FAIRCHILD and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

An Indiana prison guard named Smith was escorting a nurse named Richards through the cell block in which the petitioner, Bryan, was housed. Smith and Bryan got into an argument, and, according to Smith, Bryan reached through the bars of his cell in an unsuccessful effort to hit Smith. Smith filed a disciplinary charge of attempted battery against Bryan, who denied having tried to strike him. Unable to obtain a statement from Richards (which he claimed would support his denial), Bryan asked the prison's disciplinary board to obtain a statement from her. It refused, found him guilty of attempted battery, and ordered him confined in segregation for a year. After exhausting his prison administrative remedies and while still confined in segregation, Bryan brought this action for federal habeas corpus, claiming that the board's refusal to obtain a statement from Richards denied him due process of law. The district court ordered the record expanded with an affidavit from Nurse Richards concerning her recollection of the incident. *See* Rule 7(b) of the Rules Governing Section 2254 Cases in the United States District Courts. The affidavit was submitted and it states that she did not witness the incident. On the basis of this affidavit the district court denied relief.

Bryan has served his year in segregation and we must decide whether this moots his claim, since he no longer is in the custody that he challenged by asking for habeas corpus. 28 U.S.C. §§ 2241(c)(3), 2254(a). If a prisoner, while in custody, files a petition for habeas corpus challenging the conviction that has led to his being in custo-

dy, and is then released while the petition is pending, the petition is not moot unless there is no possibility that the conviction will have "collateral consequences," which is to say an adverse effect on him at some future time, perhaps because the conviction could be used to enhance a sentence for a future crime. *Sibron v. New York,* 392 U.S. 40, 50–58, 88 S.Ct. 1889, 1896–1900, 20 L.Ed.2d 917 (1968). So unlikely is a conviction to have no collateral consequences that it is the respondent's burden to plead and prove that the petitioner's conviction will not. *D.S.A. v. Circuit Court Branch 1,* 942 F.2d 1143, 1146 n. 3 (7th Cir.1991).

■ We have been speaking of "conviction," but the custody of which Bryan's petition complains is pursuant not to a conviction but to a sanction imposed by a prison's disciplinary board. The novel question presented by this appeal is whether in such a case the petitioner must plead and prove collateral consequences or whether, as in the case of a conviction, those consequences are presumed and the burden of rebutting the presumption is on the respondent. We think the latter is the better view. A number of cases have found collateral consequences of a disciplinary order that are sufficient to stave off a finding of mootness. *See Jackson v. Carlson,* 707 F.2d 943, 946 (7th Cir.1983); *McCollum v. Miller,* 695 F.2d 1044, 1047–48 (7th Cir. 1982); *Leonard v. Nix,* 55 F.3d 370, 373 (8th Cir.1995); *Robbins v. Christianson,* 904 F.2d 492, 495–96 (9th Cir.1990). These include effects on parole (abolished in the federal system but not in most states, including Indiana), *see* Ind.Admin.Code tit. 220, Rule 1.1–2–3(k)(3), on subsequent sentences, and on subsequent disciplinary sanctions. We have found no case in which a petition for habeas corpus was dismissed as moot because the petitioner was challenging a disciplinary punishment that could not possibly have collateral consequences. The cases we have cited are ones in which the petitioner alleged such consequences; but so unlikely is such punishment *not* to create the possibility of them that we do not think that prisoners, normally unrepresented, should be burdened with the requirement of having to plead them. If the exceptional case arises the respondent can plead and prove that the

disciplinary sanction could have no possible collateral consequences.

There is another reason for taking this approach. A disciplinary punishment so trivial as to be unlikely to have any collateral consequences will not be actionable in federal habeas corpus, because it will not have deprived the petitioner of his "liberty" within the meaning of the due process clause of the Fourteenth Amendment as interpreted in *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). This observation brings into the view the next question, which is whether Bryan, having leapt the custody barrier, can also get over the liberty barrier. We do not have enough information to determine this. *Sandin* involved only 30 days of segregation, whereas Bryan got a year. The difference in length need not be decisive. If the conditions of confinement in segregation were not so different from those of the general prison population as to "work a major disruption in his environment," or equivalently an "atypical, significant deprivation," *id.* at ——, 115 S.Ct. at 2301, then, however protracted, it would not count as a deprivation of liberty; the decrement of liberty would be too slight. But if conditions in segregation were considerably harsher than those of the normal prison environment—a factual issue requiring for its resolution a comparison between the conditions of confinement of the general population and those in the segregation unit—then a year of it might count as a deprivation of liberty where a few days or even weeks might not. This will require a remand to determine. *Whitford v. Boglino,* 63 F.3d 527, 533 (7th Cir. 1995) (per curiam). This is provided of course that there is some merit to Bryan's claim that he was denied due process. But we shall *see* that there is.

We have suggested that the proper comparison is between the conditions of segregation in Bryan's prison and the conditions of confinement of the prison's general population. But it is not certain that this is the proper comparison. The part of the *Sandin* opinion that announces the test of "major disruption ... atypical, significant deprivation" does indeed imply that the proper comparison is between the segregated or other

punitive confinement of which the petitioner is complaining and the conditions of confinement of the general prison population *of his prison. See* —— U.S. at ——, 115 S.Ct. at 2301. But earlier in the opinion the Court had discussed with approval, *id.* at ——, 115 S.Ct. at 2297, and implied that it was returning to the approach of (see *id.* at ——, 115 S.Ct. at 2298), *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). And *Meachum* had held that transfers between prisons of different severity, in that case a medium-security prison and a maximum-security prison, did not deprive the prisoner of liberty within the meaning of the due process clause. Read together, *Meachum* and *Sandin* lay the groundwork for an argument that Bryan must show that segregated confinement worked an "atypical, significant deprivation" in comparison with the ordinary conditions of Indiana's most secure prison. Maybe that is where he is, in which event the two approaches collapse into one— as in *Sandin* itself, where the petitioner was a prisoner in a maximum security prison. That is a matter for exploration on remand and a reason for us not to attempt to decide which approach is correct—comparison with the conditions of the general population of the petitioner's prison or comparison with the conditions of the general population of the harshest prison in the state. If the district judge finds on remand either that the conditions of the segregation unit in which Bryan was confined were not substantially harsher than his normal prison environment, or that they were substantially harsher than that of the normal prison environment of Indiana's most secure prison, the judge will not have to decide the proper interpretation of *Sandin.* If, however, she finds that the conditions of Bryan's confinement, while substantially harsher than the normal conditions in his prison, were not substantially harsher than those in Indiana's most secure prison, she will then have to decide what the proper comparison is. We leave that question open because it may very well wash out on remand (remember, for all we know Bryan's prison is the harshest in the state) and because it is a difficult question on which the district judge's view may be helpful to us.

We turn now to the question whether, assuming that Bryan did suffer a deprivation of liberty within the meaning that the word "liberty" bears in the due process clause, he was denied due process of law. For, if not, a remand would have no purpose.

Bryan claims that he was denied due process by being barred in effect from calling Nurse Richards as a witness at his disciplinary hearing. The affidavit that she submitted at the district judge's direction suggests that the error if any was harmless, because she did not witness the incident. But Bryan argued in the district court that if he had struck at Guard Smith "it is only logical that [Richards] would have seen such an incident ... *considering her location to the alleged incident*" (emphasis added). In other words, she was so close that if she didn't see the incident it didn't happen; she was a witness after all.

■ We don't know whether she was that close. But Bryan can hardly be faulted for having failed to establish the distance. The district judge, in violation of *Lewis v. Faulkner,* 689 F.2d 100, 102 (7th Cir.1982), failed to apprise Bryan, a nonrepresented prisoner litigant, of the consequences under Fed. R.Civ.P. 56(e) of failing to submit his own affidavit. Such an affidavit might have shown that Richards was indeed so close to Smith and Bryan when Bryan allegedly took a swing at Smith that her failure to see this is evidence, which might well have been decisive at the disciplinary hearing, that Bryan is telling the truth. In that event, the question becomes whether the disciplinary board's refusal to obtain a statement from Nurse Richards, the only potential nonprisoner witness to the incident besides the complaining witness (the guard) himself, denied Bryan due process. That is another question for the district court to consider in the first instance, though only if Bryan is able to show that he was deprived of liberty.

The judgment for the defendant is reversed and the case remanded to the district court for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

RIPPLE, Circuit Judge, dissenting.

We ought to decide the appropriate interpretation of *Sandin v. Conner,* —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), before returning this case to the district court. I do not believe that there is, as a practical matter, a judicial economy in returning this case to the district court without our first deciding the appropriate legal standard that must govern further proceedings. The Indiana Reformatory is classified as a maximum security institution for male felons. *Indiana Dep't of Correction v. Indiana Civil Rights Comm'n,* 486 N.E.2d 612, 614 (Ind.Ct. App.1985). Before we ask the district court to go behind this label of "maximum security" and to compare minutely the conditions at the Indiana Reformatory with those of other institutions that bear the same classification, we ought to determine whether such a judicial inquiry was contemplated by the Supreme Court. It does not seem at all practical to expect a federal judge to make a determination as to which state prison is the "most secure" in Indiana.